26  631
28  136

## No. 3048.

## JOHN JOHNSON *v.* THE STATE.

1. PRACTICE—WAIVER.—To the defendant's plea of former jeopardy the State interposed a demurrer, but the record fails to show in any manner that either the plea or the demurrer was acted upon by the court. *Held* that, under our practice, the plea of former jeopardy must be treated as waived.

2. SAME—EVIDENCE—PREDICATE.—See the statement of the case for evidence *held* sufficient to establish a predicate for the reproduction of the testimony on a coroner's inquest of a non-resident witness not present on the trial.

3. "ADEQUATE CAUSE"—PROVOKING A COMBAT WITH INTENT TO KILL—CHARGE OF THE COURT.—Article 602 of the Penal Code provides that, "in order to reduce a voluntary homicide to manslaughter. it is necessary not only that adequate cause existed to produce the state of mind referred to in the third sub-division of article 594 (anger, rage, sudden resentment, or terror, rendering it incapable of cool reflection), but also that such state of mind did actually exist at the time of the offense." Article 603 provides that, "though a homicide may take place under circumstances showing no deliberation, yet if the person guilty thereof provoked a contest with the apparent intention of killing, or doing serious bodily injury to the deceased, the offense does not come within the definition of manslaughter." The trial court in this case charged the jury literally the language of the said articles, and, under the proof, the charge was sufficient.

4. MURDER—MANSLAUGHTER—JUSTIFIABLE HOMICIDE—CHARGE OF THE COURT, applying the law of self defense to the facts in proof, instructed

the jury as follows: "If you should find from the evidence that, prior to the shooting, the deceased forcibly and without defendant's consent, seized money that was defendant's property, or that defendant fairly and reasonably believed was his property, and that deceased refused to give up such money, and that, when defendant returned to where deceased was, he returned not for the purpose of provoking a difficulty, and inflicting injury upon deceased, but, on the contrary, only for the purpose of making a demand quietly and peaceably and unaccompanied by force, of the said Gilstrap, that the money should be returned, and if, with such purpose and intent, defendant did return to the room and quietly demand the return of such money, not intending nor contemplating at the time that such demand would result in a difficulty in which death or serious bodily injury would result, then and in such case, if the defendant afterwards shot and killed W. T Gilstrap, it would be *either murder in the second degree or manslaughter, or justifiable homicide*, according as you should find the other parts of the case under former instructions of the court." *Held* erroneous, because, while the proof called for a charge upon the hypothetical case stated, the facts, if found to be true, would make a clear case of justifiable homicide only. See the opinion for a special charge which, embodying correctly the law upon the subject, was erroneously refused.

5. SAME.—Upon the issue of self defense, the defendant requested the trial court to charge the jury as follows: "If you believe from the evidence that the defendant re-entered the gambling room with the intention of renewing or provoking a difficulty with the deceased in order to get a pretext to kill him, and after entering the room he declined the combat and retreated, then under these circumstances the defendant will not be considered to have forfeited his right of self defense, but the same would be complete, and he would have the right to defend himself against any attack thereafter made upon him by deceased." *Held* that, the proof tending in some degree to raise the issue, it was error to refuse the charge.

APPEAL from the District Court of Taylor. Tried below before the Hon. T. H. Conner.

The conviction in this case was in the second degree for the murder of W. T. Gilstrap, the penalty assessed being a term of six years in the penitentiary.

D. A. Campbell testified, for the State, that he lived now in the city of Fort Worth, but was in Abilene, Taylor county, at the time of the difficulty between the defendant and W. T. Gilstrap. The killing of Gilstrap occurred in the old frame building on the corner of North First and Pine streets, then occupied as a saloon. The front room was a saloon; the next was a gambling room, and the rear room was the wine room. The building fronted east. The door between the saloon and

the gambling room was near the northeast corner of the latter.
The door between the gambling room and wine room was about
the center of the dividing wall.   The south window of the gam-
bling room looked out on North First street.   The said window
and the two said doors were the only openings to the gambling
room.   The plat now exhibited was made by witness and was
correct:

Statement of the case.

Describing the premises, the witness said that the building, without the wine room, was sixty feet long—east and west—and twenty-five feet wide. The gambling room, in which the killing occurred, was twelve by twenty-five feet in size. There was a round poker table in the south extreme of the room, near the window, a stud poker table opposite at the north extreme, and a monte table near the east or partition wall between it (gambling room) and the saloon. The saloon contained the bar in the northeast corner, a lunch counter in the southeast corner, and a pool and a billiard table were in the west part of the saloon proper.

While standing at the stud poker table, about ten o'clock on the fatal night, the witness heard angry voices at the monte table, and went to it. About the time the witness reached the monte table, the deceased and Carmichael crossed to the round poker table and sat down. Witness followed and asked deceased what was the matter. He replied: "They are trying to give me the worst of it—to rob me." He at that time had an ordinary pocket knife in his hand, and was rubbing the blade back and forth on his boot leg. At the time that deceased moved from the monte table the defendant took a seat on the back of a chair near the monte table, with his feet in the seat. He kept that position for several minutes and then left the room, going into the saloon. Witness remained with deceased and Carmichael at the round poker table for a few minutes, and then passed into the saloon. He left deceased and Carmichael at the round table, at which time the deceased had closed his knife, but witness could not say that he had put it in his pocket. No words passed between defendant and deceased after the time that deceased went from the monte to the round table and before the time that defendant went into the saloon. As witness passed into the saloon he met the defendant going back into the gambling room, and by the time he reached a point midway between the billiard and pool tables he heard a shot fired in the gambling room. He then left the building, and so far as he could recollect did not hear the second shot that was said to have been fired. The witness did not see the shooting nor anything else that transpired in the gambling room after he left it.

As a predicate for the reproduction on this trial of the testimony of D. B. Carmichael, as delivered at the inquest upon the body of the deceased, the State proved by S. P. Hardwicke that, as county attorney, he interrogated said Carmichael at the said.

inquest, and by direction of the justice of the peace reduced his testimony to writing, to which Carmichael subscribed. The defendant was present and was offered an opportunity to cross examine the witness Carmichael, which he declined to do. Carmichael, as shown by his recent correspondence with the witness, was now a permanent resident of Chicago, Illinois. The written testimony of the said Carmichael was delivered to H. L. Bentley, the then district attorney, and had not since been seen by witness. H. L. Bentley testified, in substance, that the written testimony of Carmichael, referred to by the witness Hardwicke, was delivered to him by the said Hardwicke, and remained in his possession until his residence, where he then kept all papers pertaining to his office, and nearly all of its con-tents, were destroyed by fire, since which time, though he had made diligent search for it, he had been unable to find the said written testimony of the witness Carmichael. This predicate being held sufficient, the said S. P. Hardwicke stated that, at the inquest, D. B. Carmichael testified, in substance, that he was standing at the stud horse poker table when the dispute between the defendant and deceased began. It was apparent that defendant, who had been dealing, and deceased, who had been betting, had a misunderstanding about a bet. Witness Carmichael asked what was the matter. Deceased replied: "They are trying to give me the worst of it, and I won't be rob-bed." Defendant claimed that the deal impugned by deceased was fair, and the deceased claimed that the cards had been stocked on him. Deceased had taken two dollars from the funds of the "bank," and defendant was insisting that he should return the money to the bank. In reply to the demand that he should return the money, deceased said that he had been robbed, and that he would "like to see any d——d son of a bitch make him put it back." Defendant said to deceased: "Tom, that's mighty hard talk for you to make to a boy;" to which deceased replied: "Well, my talk goes, anyhow!" The wit-ness and deceased then went to the round table and sat down, and about that time Gardiner took the dealer's chair and de-fendant took a seat on the back of a chair, with his feet in the bottom of the chair, near the monte table. Deceased, who was then sitting at the round table, threw one leg over the other and began to rub the blade of an open pocket knife back and forth on his boot leg. Four or five minutes later, nothing being said in the meantime by either of the parties to the other, de-

fendant went to the wine room door, and, finding it locked, thence into the saloon. Deceased, who remained with witness at the round table, was then quiet, and appeared to have recovered his good humor. About five minutes later, defendant, with a billiard cue, butt down, in his hand, stepped into the gambling room, from the saloon, advanced to about the middle of the floor, and asked of deceased: "Tom, are you going to put that money back?" Witness, crying "hold on there!" sprang towards the defendant, who took a step or two backward, and "went for his gun." The people who crowded the room then made frantic efforts to get out. Deceased by that time was in the southeast corner of the room, trying to get behind somebody. He then started towards the door into the saloon, going in the direction of the defendant and of the east wall. When he reached a point near and opposite the defendant, the defendant threw his pistol on and very nearly against him. Deceased turned his side towards defendant, and threw out his hands as if to seize defendant and then the defendant fired. Defendant and deceased then clinched, and witness passed into the saloon, a second shot being fired just as witness passed through the door. Witness and others soon returned to the gambling room, and found the defendant and deceased holding to and struggling for possession of the pistol, with the deceased holding to defendant's ear with his teeth. The parties were then separated, and the defendant arrested.

Tobe Hill testified, for the State, that he was standing at the monte table when the fatal quarrel began. Deceased had played a winning game against the bank as long as Bob Gardiner dealt the cards. Defendant, who was Gardiner's partner in the game, proposed that he try his luck at dealing, Gardiner consenting, he took the dealer's chair, deceased remarking at the time that he did not want any "bad dealing." Deceased then placed a five dollar bill on a card, betting two dollars of it. He lost that bet, and staked the remainder of the bill on another card. Defendant turned the cards, and placed the same on the table, showing the winning to be in favor of the bank. Deceased said: "Let me see those cards." Defendant replied: "The deal was fair," and ran over the cards, showing them to deceased. Deceased said: "That don't go; the deal is foul," and reached over the table and took two dollars from the bank. Defendant insisted that deceased should put the money back. Deceased cursed defendant, and said that no d—d son of a bitch

could make him put it back. Deceased, with an open pocket knife in his hand, then walked over to the round table and sat down. Defendant took a seat on the back of a chair. About five minutes later defendant went into the saloon. He soon returned to the gambling room with a billiard cue in his right hand, and asked deceased: "Tom, are you going to put that money back?" Deceased sprang from his seat and advanced towards defendant and the door in the northeast corner of the room. Defendant dropped the cue and drew his pistol. Deceased, with his body bent sideways to the defendant, extended his hands as if to seize defendant's pistol, and the pistol was discharged. Deceased then caught the pistol, and a struggle for possession of the same ensued between him and defendant, and the pistol was discharged the second time, without taking effect. The first shot entered deceased's body just above the left nipple, and passed out just below the right nipple.

On cross examination, this witness said that he saw an open knife in deceased's hand while he was at the round table, but did not know whether or not he had it in his hand when he got up or when he was shot. Witness did not see deceased attempt to get behind any person when defendant drew his pistol, nor did he at any time during the difficulty hear deceased say to defendant: "G—d d—n you, you have got to fight." Nor did he at any time hear the defendant say: "I don't want to fight." To get to the door from the round table, deceased would have had to pass between the defendant and the monte table.

Jack Keith, the bar porter, testified substantially as did the witness Hill, up to the time that defendant left the gambling room, before the shooting. Soon after the defendant went out of the gambling room, witness went to the bar to get some drinks ordered by some parties at the monte table. As he passed into the saloon he saw the defendant at the billiard table pounding balls. Defendant stepped into the gambling room just behind witness, when witness returned to that room with the drinks. As the witness placed the drinks on the table defendant stepped forward and said to deceased, who was sitting at the round table: "Tom, are you going to put that money back?" Deceased, who appeared to be angry, jumped to his feet, and, the witness thought, rushed towards defendant. Witness rushed out of the room, and as he passed into the saloon he heard the first shot, and soon afterwards the second. The witness was not positive but thought that deceased had his

knife in his hand when he sprang from his seat at the table. An open pocket knife was found on the floor of the gambling room by Will Brown after the difficulty. Witness saw Brown pick it up. Brown was now a resident of New Mexico. Witness did not hear the deceased say to defendant: "God d—n you, you have got to fight." If defendant had anything in his hand when he re-entered the gambling room, witness did not see it.

It was proved that defendant forfeited his bail bond, and was re-arrested in Cheyenne, Wyoming.

The State closed.

William Hurley testified, for the defense, that after losing the several bets as stated by the witness for the State, deceased seized two dollars of the bank's money, when defendant, who was then dealing, said: "Gilstrap, put that money back into the game!" Deceased replied that "no d—d son of a bitch could make him put it back," and otherwise referred to defendant as a "d—d son of a bitch of a kid gambler." Deceased then went to the round table and sat down, took out a pocket knife, which he rubbed on his boot leg, and continued to curse and abuse defendant, remarking in the course of his talk that "I will have to kill some of these d—d gamblers yet." After sitting on the back of a chair a few minutes, the defendant went into the saloon and witness to the west end of the stud horse poker table. A few minutes later the defendant, with the billiard cue held in both hands behind him, re-entered the gambling room, and asked deceased: "Tom, are you going to put that money back?" Deceased replied: "No, I am not, and the son of a bitch who tries to make me put it back will have to fight." Defendant replied: "I don't want to fight." Deceased replied: "God d—n you, you have got to fight!" sprang from the table with an open pocket knife in his right hand, and started sideways towards defendant with his left hand raised to a level with his head. Defendant then exclaimed: "Catch him, boys; he has got a knife!" dropped his cue and drew his pistol, and, when deceased had almost reached him, fired. An open knife dropped from the hands of the deceased at the crack of his pistol, and defendant and deceased clinched. About that time the witness got out of the room. The witness was present and saw the dealing of the games on which the deceased lost the money he bet, and witness knew those games to have been fairly dealt, and so decided when appealed to by defendant at the time de-

ceased questioned them.   The defendant had his pistol on his person while dealing the game.   Deceased had taken five or six drinks during the time he played at the game.   Deceased was about thirty-eight years old and defendant about eighteen at the time of the killing.   The reputation of the deceased was that he was a dangerous and violent man.

Robert Gardiner, the next witness for the defense, testified substantially as did the witness Hurley, and in addition, that when deceased sprang from his seat at the table, and rushed towards defendant with the open knife in his hand, Carmichael seized the billiard cue which was in defendant's hand, and that the defendant did not draw nor attempt to draw his pistol until Carmichael seized the cue, and deceased rushed at him.   Deceased had been drinking freely and was about "half tight" when the shooting occurred.   Defendant had the pistol on his person when the quarrel first began.

R. C. Ware, A. J. Long, H. G. Bardwell, J. W. Germany and C. A. Wooldridge testified, for the defense, that they knew the reputation of the deceased for peace or violence.   He was a man of great courage, inoffensive and peaceable when sober, but very violent and dangerous when under the influence of liquor.

*Charles I. Evans,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE.   There was a demurrer to defendant's plea of former jeopardy, but there is no direct positive evidence in the record that any action whatever was taken by the court either upon the demurrer or the plea, and counsel for appellant in his able brief filed in the case makes no mention of the matter.   According to settled practice, it will be considered that the plea is waived by appellant.   (State v. Thompson, 18 Texas, 527.)

1.   A proper predicate was laid for the introduction of the testimony of the absent witness Carmichael as given at the coroner's inquest, said witness being shown to be beyond the jurisdiction of the court.   (Conner v. The State, 23 Texas Ct. App., 384, and authorities cited; Parker v. The State, 24 Texas Ct. App., 61.)

2.   Most of the errors complained of and insisted upon in the brief of counsel are directed at various paragraphs of the charge of the court upon the law of manslaughter and self de-

fense.   Two of the paragraphs seriously insisted upon as erroneous, in which the court announced the law with regard to the existence of adequate cause and provoking a contest with intent to kill, are literal copies of articles 602 and 603 of the Penal Code, and have been the law of this State at least since the adoption of our Codes.

3.   We are of opinion, however, that error has been committed by the learned judge, prejudicial to the rights of defendant, in his application of the principles of the law of self defense to the evidence, and for which the judgment will have to be reversed.   Amongst other matters, the court instructed the jury as follows, viz: "If you should find from the evidence that, prior to the shooting, the deceased forcibly, and without defendant's consent, seized money that was defendant's property, or that defendant fairly and reasonably believed was his property, and that deceased refused to give up such money, and that, when defendant returned to where deceased was, he returned not for the purpose of provoking a difficulty and inflicting injury upon deceased, but, on the contrary, only for the purpose of making a demand quietly and peaceably and unaccompanied by force, of the said Gilstrap that the money should be returned; and if, with such purpose and intent, defendant did return to the room and quietly demand the return of such money, not intending nor contemplating at the time that such demand would result in a difficulty in which death or serious bodily injury would result, then, and in such case, if defendant afterwards shot and killed W. T. Gilstrap, it would be *either murder in the second degree, or manslaughter, or justifiable homicide*, according as you should find the other facts of the case under former instructions of the court."

The evidence adduced called for a charge upon the hypothetical case stated, but the facts stated, if found to be true, would have made a clear case of justifiable homicide, and it was error to tell the jury that upon such a state of facts the offense committed *would be either murder in the second degree or manslaughter*, or justifiable homicide.

To correct this palpable error in the court's charge, defendant's counsel requested a special instruction, which the court refused, and which was in these words, viz:   "If you believe from the evidence that defendant returned to the gambling room, not for the purpose of renewing or provoking a difficulty

41

with deceased for any purpose, but with an honest intention to demand of deceased the return of the money which defendant honestly believed that the deceased had wrongfully taken from him, and that the deceased, in refusing to comply with such demand, made an unlawful attack upon defendant with a knife, of such a nature as to inspire defendant with the reasonable belief that he was in danger of serious bodily injury from such attack, and that, acting on such belief, defendant fired the fatal shot, he would be justified in so doing." This requested instruction presented the law as applicable to the facts stated, and the court erred in the charge as given and in refusing said instruction. (Bonnard v. The State, 25 Texas Ct. App., 173; Alexander v. The State, Id., 260; White v. The State, 23 Texas Ct. App., 154; Green v. The State, 12 Texas Ct. App., 445; Meuly v. The State, ante, 274, decided at the present term, and a case in many respects similar to the one under consideration.)

Another requested instruction which was refused was in these words, viz: "If you believe from the evidence that defendant re-entered the gambling room with the intention of renewing or provoking a difficulty with the deceased in order to get a pretext to kill him, and, after entering the room, he declined the combat and retreated, then, under these circumstances, the defendant will not be considered to have forfeited his right of self defense, but the same would be complete and he would have the right to defend himself against any attack thereafter made upon him by the deceased." There was some evidence in the case upon which to base the instruction and it was error to refuse it.

Other errors are assigned and argued in the brief, but they are of a character not likely to arise on another trial, and are, therefore, not discussed. For the error pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*