JIM BURRIS, ALIAS JIM TOOTS, v. THE STATE.

*No. 613.   Decided April 24.*

1. **Murder—Provoking Difficulty—Self-Defense—Charge.**—On a trial for the murder of a policeman, where it was shown that deceased and defendant had but recently had a difficulty, and that defendant went off, and shortly thereafter, with several armed friends, appeared upon the street and provoked the difficulty anew, whereupon the deceased fired upon him, and he ran, and fired over his shoulder, killing the deceased, *Held*, that the court, in connection with his right of self-defense, properly and correctly instructed the jury, "that if a party be unlawfully and violently attacked, such an attack would not justify homicide, if the party killing had provoked the difficulty with the intent to kill his assailant, or had voluntarily engaged in a difficulty with the person killed."

2. **Same—Abandonment of Difficulty—Right of Self-Defense.**—On a trial for murder, where defendant, in company with other confederates, provoked the occasion which brought about the killing, he could not after the difficulty began reinstate himself in his right of self-defense, unless he abandoned the difficulty or conspiracy in good faith; and a mere retreat and firing back is not sufficient.

3. **Same—Responsibility for Acts of Other Coconspirators.**—On a trial for the murder of a policeman, where defendant, in company with other confederates or coconspirators, provoked the difficulty, and defendant fled, but his coconspirators remained and continued to fire upon the deceased and other officers with him, *Held*, that the acts of said confederates being the acts of his (defendant's) agents and coconspirators, were his acts, and that to reinstate himself in his right of self-defense, he must not only have abandoned the difficulty himself in good faith, unequivocally, but his coconspirators must have done so also.

APPEAL from the District Court of Tarrant.   Tried below before Hon. S. P. GREENE.

This appeal is from a conviction of murder of the first degree, with the penalty assessed at death.

The salient features of the case are concisely stated in the opinion, but in order to illustrate further the nature and character of the conspiracy between defendant and his confederates, after the first difficulty between defendant and deceased, we reproduce the following portions of the testimony from the statement of facts.

J. H. Maddox, for the State, testified: "I am city marshal of Fort Worth, Texas, and was when Waller was killed. About twenty minutes before Waller was killed I was coming up Rusk street, and when I got to the corner of Rusk and Twelfth streets, I heard, to the east of me, Horace Bell and Will Campbell cursing a negro woman because she would not let them have a pistol. I went over to them where they were, and told them to hush that cursing and go home, or I would lock them up. They seemed very angry, and both started off west together; and when they crossed Rusk street, and just as they were stepping upon the sidewalk, I heard one of them say. 'We'll get the sons of bitches yet.' At this time I hadn't heard that Toots and Waller had had a difficulty. Every effort possible was made to capture Toots after he killed Waller, but he was not captured until five or six days afterwards. He was captured at Big Springs, 200 or

300 miles west of Fort Worth. I went to Big Springs after him. I examined his head when I first got him, to see if he had received any injury from Waller. There was not a scratch or swollen place about his head; no sore nor anything to indicate he had been struck on the head."

Lou Overton testified: "I ran a saloon on the corner of Twelfth and Rusk streets at the time Waller was killed, last summer. About 12 o'clock that night I was in my saloon, when Will Campbell came in and asked me for my gun (pistol). I told him I wouldn't let my brother have my gun. He then walked up to my door and looked out west, on Twelfth street. I asked what was the matter. He said, 'nothing.' I then walked to the same door and looked up in the same direction, and saw a crowd in front of Curry's saloon. All at once I looked back in my saloon, and saw Jim Toots going behind my counter after my pistol, and I caught him and told him he could not have my pistol. He then went out the same door I saw Campbell in. Toots went west to where the crowd was, in front of Curry's, and began to curse and swear. I went up there, and Toots was out in the street cursing the officers, and making threats that he would kill the brass-buttoned sons of bitches; that they couldn't walk their beats and live. I heard him say, in his cursing, that he didn't have an even break with them. As he said this two other negroes stepped up to him, and said, 'We'll see that you do have an even break.' Then Toots and these two negroes, with Charley Ware, left there and went east on Twelfth street. I never heard anything more until the shooting. Officers Waller, Towns, and Bryant came up to the corner of Twelfth and Rusk streets fifteen or twenty minutes before the killing. I saw them start down Rusk street. I stood in my east door to watch them. Just after I saw them pass, I saw some negroes coming up Rusk street. I saw the flash of two pistol shots fired north, from in front of the officers—I thought within five or six feet of them. The officers then seemed to return the fire, and shooting began from across the street at the officers. I saw one negro seem to walk and shoot from the southeast corner of Thirteenth and Rusk to the middle of the block east of Rusk. There was firing all around there."

Jim Mann testified: "I heard Jim Toots making threats to kill the officers in front of Curry's, some thirty or forty minutes before the shooting. Toots left there, and some one or two with him. They went east on Twelfth street. A short while after they went east they came back by Curry's, going west on Twelfth. At this time Horace Bell and Toots were together, and Will Campbell, I think, was with them and walking behind them, and then still further behind were some more negroes, following. I watched Toots, Bell, and Campbell until they turned at the corner of Twelfth and Main streets to go south. As Toots passed by Curry's saloon this time with Horace Bell, I heard Toots say, 'I don't need any of you damned negroes' help. I've got all I want.' He said nothing more as he passed this time. I

remained around there in front of Curry's until the officers, Towns, Waller, and Bryant, came up there, which was within ten or fifteen minutes after Toots and Bell, I think, and Campbell had passed Curry's going west, as just stated. The officers staid around the corner of Twelfth and Rusk streets some little time, and then they started back south on Rusk. I walked along several feet behind them. About the time the officers got near the corner of Thirteenth and Rusk, I saw the flash of a pistol come from what I thought the officers' right, out in Thirteenth street. Immediately the officers began to shoot. The first two shots were very close together. They began all around there. Then I got out of the way. The two first shots were as close together as could be fired—one from Thirteenth street, and the other from the officers."

Hill Deering testified: "On the night Waller was killed I was bar-tender for George Holland, at Holland's theater. I saw officers Waller, Towns, and Frank Bryant leave the theater together. About five minutes after they left, I saw Jim Toots and two other negroes near the west door of my bar room, going towards the door. As they were there, my porter, Charlie Weaver, called to Jim Toots, and Toots turned partially around. I saw in his right hand what I thought was the handle of a pistol. His right hand was up to his bosom. He turned to look at Weaver, but never said a word to Weaver or any one else that I heard. They went on out. The west door they went out at led onto Rusk street. My bar was on the south side of the barroom, and to the west of the barroom is a hall leading out into the theater yard, where the people who came to the theater usually congregated. Toots and the other two negroes were going from that direction when I saw them. No negroes were allowed in there or in the barroom, except a few train porters. I never saw Jim Toots in there before, nor either of the negroes with him. Never sold Toots anything that night. He never called for anything, nor did either of the other negroes with Toots. To the best of my knowledge, Horace Bell was one of the negroes who was with Toots in my barroom, as above stated, and Will Campbell was the other. Horace Bell is about an inch taller than Toots, and Campbell is lower than Toots. I didn't know Campbell and Bell on that night, but was well acquainted with Toots. About ten minutes after Toots and his party left my bar, I heard the shooting up on Rusk street."

*Furman & Bowlin,* for appellant, filed an able brief in the case, and upon the questions discussed in the opinion submitted the following propositions:

On the law of self-defense: Even if the evidence for the State tended to show that appellant voluntarily engaged in the difficulty, or that he provoked the difficulty in which deceased lost his life, under such cir-cumstances and in such manner as to deprive himself of the right of self-defense, yet, under the evidence showing that he did not volunta-

rily engage in such difficulty, and that he did not provoke such difficulty, the court should have charged the jury the converse of the proposition; that is, in substance, that if he did not provoke the difficulty with the intention of killing deceased, etc., or if he did not voluntarily engage in such difficulty, knowing that death or serious bodily injury might result to himself or his adversary, then that he had the right to act in his self-defense and kill deceased to prevent deceased from killing him. Bonner v. The State, 29 Texas Crim. App., 231; Wills. Crim. Stats., sec. 2338, and cases cited.

The evidence for the State tending to show that a number of persons took part in the killing of deceased; that he was fired upon from different directions, and received three wounds in different parts of his body; and the evidence not showing which wound was mortal, and not showing who inflicted it; and the evidence of appellant showing that he did not act together with the other persons who engaged in the difficulty; that he fired but one shot while retreating from deceased, and then left the scene of the combat; the court should have charged on this theory of the case in appellant's favor, in effect, that if he (appellant) fired but one shot and abandoned the difficulty, and was not acting together with such other persons, who so engaged in such difficulty, in such manner as to make him responsible for their acts, and that such other persons then killed deceased. that appellant would not be guilty of murder. Bonner v. The State, 29 Texas Crim. App., 223; Wills. Crim. Stats., sec. 2338, and cases cited; Guffe v. The State, 8 Texas Crim. App., 187.

*Ayers & Ayers* and *Albert Stevenson*, for the State, filed an able brief.

*R. L. Henry*, Assistant Attorney-General, for the State, also filed briefs in the case.

HURT, PRESIDING JUDGE.—This is a conviction of murder in the first degree, with the death penalty, for the homicide of Lee Waller.

It appears from the evidence offered by the State in this case, that the deceased was a policeman in the city of Fort Worth; that on the night of the homicide, in the discharge of his duty, he arrested a woman of the town for being on the street in violation of an ordinance of the city which authorized the arrest. Defendant was with her at the time, and interfered, using some abusive epithets towards the officer. After the arrest, it appears that the officer, in company with another officer, who was present at the time, left the place, and went to the theater. In the meantime, the defendant got certain of his friends, and procured arms, all the while making threats and using abusive language with reference to the deceased and officers generally. The defendant created such a disturbance on the streets, that it appears some one went to the theater and requested the officers to come and arrest the defendant. The deceased, in company with two officers, left

the theater for that purpose, and as they came down the street, looking for defendant, about half way down the block from Twelfth street they noticed several negroes crossing Fourteenth street, coming north. As these negroes passed the officers, they (the officers) were fired upon by some one on Thirteenth street. The shot was fired by the defendant, and was aimed at Waller, the deceased. At the time of the firing the defendant appeared to be concealed, or squatted down. Deceased drew his pistol, and fired about the same time defendant fired his second shot. The officers then began firing, and they were fired upon by others, besides the defendant, from two different points. After the deceased fell, the defendant ran off, and made his escape. The defendant testified in his own behalf, told about the arrest of the woman, and that the officer, because he said something about it, seemed to get mad at him, and threatened to arrest him. He asked him what he had done, and he called him a son of a bitch, and told him to dry up; that the deceased then hit him a hard lick on the head with his policeman's club, which caused him to stagger and come near falling; that the deceased then drew his pistol and and tried to shoot him, but was prevented by the other policeman, Towns. The defendant denies that he induced his friends to join with him to make an assault upon the officers, or to raise a disturbance. He says: That he tried to get a pistol at Overton's saloon, but that he would not let him have it; and that he went to Snow's saloon, and got a pistol. That he got it for the purpose of protecting himself. That he then went to his own house, and was bathing his head in cold water, which was hurting him from the stroke he had received from the deceased's club. While he was there, the deceased, Frank Bryant, and Ware, two other policemen, came to his house, with pistols, looking for him. That he squatted down behind the water barrel, and heard them say, "We will kill the damn son of a bitch;" that he was frightened, and ran from there, and got in a closet on the place. That he went out of there, and jumped over his back yard fence, and went west on Fifteenth street. When he got near Thirteenth street, on his way to Curry's saloon, where he intended to hide from the officers, he saw the officers coming, with pistols in their hands. The deceased immediately shot at him. Defendant turned and ran south, and just as he was stepping on the south sidewalk of Thirteenth street, he stumbled and fell, and deceased shot at him again. That he then shot at Waller, kind of back over his shoulder, and ran on in a southeast direction to Rusk street, and made his escape. He stated, that after deceased fired his second shot at him it looked like all the officers were firing at him, and that he did not know that Horace Bell, George Davis, Will Campbell, or anybody else was along there that night when the shooting began.

Under this state of facts, the court, among other things, instructed the jury in regard to self-defense substantially as follows: That if a party be unlawfully and violently attacked, such an attack would not justify homicide if the party killing had provoked the difficulty with

the intent to kill his assailant, or had voluntarily engaged in a difficulty with the person killed. The doctrine of provoking the difficulty occurs in several places in the charge upon the right of self-defense. Counsel for appellant at the time excepted to the court's charging this doctrine and mutual combat, because, they say, there was no evidence tending to prove that appellant provoked the difficulty. We do not take this view of the case. The evidence clearly shows that appellant produced the occasion with a view of having the deceased killed or killing him himself. Having produced the occasion, to reinstate himself to the right of self-defense he must have abandoned the difficulty or conspiracy in good faith; a mere retreat and firing back will not be sufficient. The difficulty must have ceased, or he must have shown to his adversaries, the officers, an unequivocal intention to abandon the difficulty. Again, those who were acting with him were his agents, and must have abandoned the difficulty also, for he is responsible to the same extent as if he had done the acts committed by any one of the coconspirators engaged in the assassination; and, to reinstate himself to his right of self-defense, he must not only have abandoned the difficulty himself, in good faith unequivocally, but his coconspirators must have also done so, for he is responsible for their acts. Now, as soon as the firing commenced, his coconspirators, from different directions, began to fire upon the deceased and the officers, and continued to fire for sometime; some one of whom inflicted the wound in the shoulder of deceased. Every shot fired by a coconspirator was the act of the defendant. Appellant was responsible for their conduct, and they evidently did not abandon the difficulty. The doctrine of provoking the difficulty was called for by the theory of the State. The court gave to the jury a charge on the theory of the defense, namely, self-defense; and the charge was so shaped as that the jury could not have been confused thereby, but if they believed defendant's theory, they would give him full and untrammeled right of self-defense.

We have given this record and the questions submitted a most searching examination, but we have found no errors for which the judgment should be reversed. The judgment is accordingly affirmed.

*Affirmed.*

Judges all present and concurring.