CLIFTON ROGERS v. THE STATE.

No. 2088. Decided June 27, 1913.

**1.—Assault to Murder—Charge of Court—Provoking the Difficulty—Intent to Kill.**

Where, upon appeal from a conviction of assault to murder, defendant complained of the court's charge in submitting the issue of provoking the difficulty that he had failed to submit the issue of defendant's want of intent to kill, the evidence showed that the defendant made the assault with a deadly weapon with such an intent, there was no error, as under article 51, Penal Code, the intention to commit an offense is presumed whenever the means used is such as would ordinarily result in the commission of the forbidden act, etc. Following McCoy v. State, 25 Texas, 33, and other cases.

**2.—Same—Manslaughter—Charge of Court.**

Where, upon trial of assault with intent to murder, the evidence did not raise the issue of adequate cause, there was no error in the court's failure to submit the law of manslaughter.

**3.—Same—Charge of Court—Aggravated Assault.**

Where, upon trial of assault with intent to murder, the evidence did not raise the issue of aggravated assault, there was no error in the court's failure to charge thereon.

**4.—Same—Charge of Court—Provoking the Difficulty—Sufficiency of the Evidence.**

Where, upon trial of assault to murder, the facts and circumstances in evidence all pointed to the fact that the defendant sought the party injured with a deadly weapon to engage in a deadly affray, the same raised the issue sufficiently to authorize the court to submit the law of provoking the difficulty, and the evidence sustaining the conviction of assault to murder under a proper

charge, there was no error. Following Cartwright v. State, 14 Texas Crim. App., 486, and other cases. Davidson, Presiding Judge, dissenting.

**5.—Same—Self-defense—Charge of Court.**

Where, upon trial of assault to murder, the evidence raised the issue of provoking the difficulty and the court submitted this issue and the converse proposition thereof, and also submitted the law of self-defense in that event, there was no reversible error. Davidson, Presiding Judge, dissenting.

Appeal from the District Court of Jasper. Tried below before the Hon. W. B. Powell.

Appeal from a conviction of assault to murder; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*J. J. Lee,* for appellant.—On question of the court's error in submitting the provoking of the difficulty: Pollard v. State, 73 S. W. Rep., 953; Dent v. State, 79 S. W. Rep., 525; Reese v. State, 49 Texas Crim. Rep., 242, 91 S. W. Rep., 583; Beard v. State, 81 S. W. Rep., 33; Lockhart v. State, 53 Texas Crim. Rep., 589, 111 S. W. Rep., 1024; Airhart v. State, 40 Texas Crim. Rep., 470; Koller v. State, 36 id., 496; Gilcrease v. State, 33 id., 619; Bow v. State, 34 id., 481.

On question of court's failure to submit want of intent to kill: Alexander v. State, 25 Texas Crim. App., 260; Green v. State, 12 id., 445; White v. State, 23 id., 154.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.—Appellant was prosecuted and convicted of assault to murder and his punishment assessed at two years confinement in the State penitentiary.

We can not agree to the opinion of our Presiding Judge, and we copy here virtually the entire evidence in this case.

Arch Neyland testified: "I know Clifton Rogers. There he is sitting over there. Clifton Rogers was shooting at me, I don't know just how far he was in shooting distance of me, though, close enough to hit me. I don't know how many times he shot at me, I suppose that he shot until he emptied his gun. The pistol he had shot six times. This difficulty came up about gambling, we had been gambling and I broke him. We were playing cards and I won all of his money. When I won his money he would not give it to me. I asked him for it and he would not give it to me, and I told him he could have it, and the fuss started from there, and he told me he was not going to give it to me, and I told him it was all right he could have it. He got up then and went out and went down to Buster Hafford's and got a pistol, and Buster Hafford tried to take it away from him and he would not let him have it. It was not but a few minutes after we quit playing cards until he went home after his pistol. We had to go about as far as across the street over there. I would say something like about thirty or

forty or fifty yards. When he went out of there I went out behind him. Sam Bolder called me and I stopped and Buster said, 'You go in Mitchell's house, that boy has gone after my (his) pistol.' I went in Mitchell's house and this boy came the back way and went on up to the house where I was at and went in the house and I went out and went across the street and he went across the street behind me and I went in another house. I got a Winchester when I went in that house. I went on back to my house and was standing out in front of the gate talking to a boy and I looked around and he (appellant) was trying to slip up on me. As I looked around he pulled out his pistol and commenced shooting, and when he made two shots I commenced shooting at him. I think it was about twenty minutes from the time we were playing cards until the time the shooting commenced. The shooting took place in front of my house at the far end of the quarters.

"I could not say exactly how much money I had won from him. We were gambling in a house down there. I could not tell you who all was gambling. There were others besides myself and Clifton Rogers. I asked him for the money and he would not give it to me. He left out ahead of me and left me standing in there. He did not go to his boarding place at all. He went to the railroad track after he got the pistol and come back after me. When I went up there I saw him on the railroad track. He was coming towards my house. He was on the railroad track coming back when I saw him, coming towards my house, about as far as from here to the jail from me. He was in shooting distance of me at that time. My boarding house was close to the track. I went from the gambling hall towards the railroad track, my boarding house was right across over this way, about two blocks, and I went down this way. When I saw him coming in that direction I went in the house. Buster told me to go in the house he was coming with his pistol, and I went in a boy's house called J. Mitchell. I did not get a pistol in there, I went up there and got a gun from Hafford, that was after he had done run me. After I ran, I went back up towards the gambling shack. I went up there and got a gun and come on back to where I stayed. He had to come right by the gambling house and I went on around and was talking to Horace Flint and he was slipping up on me. It was about twenty minutes from the time he had been running me with the gun until he came back to the boarding house. He just came on behind me with the gun and Buster was trying to take it away from him; he was following me on up with it. We were about 100 yards apart when he was following me up. I could not tell you how close he was to me when he fired the shot, but he was in shooting distance. I would say he was about thirty or forty yards from me. Just about as far as across the street. The reason he did not shoot me or make any effort to shoot me when we were walking along there was because Buster had hold of him, he had hold of his arm trying to get the pistol away from him. He could not get it away from him and he let him alone,

Vol. 71 Crim.-18.

when he turned him loose I came on to where I got the pistol. He was about as far as across the street from me at that time. He did not try to shoot me, he could not shoot me because I was in the house and he was about 100 yards from the house. He did not say anything to me about stopping. After this fellow let him go he did not make any effort to shoot me until he came around from across the railroad track. This gun he had was a 41, I don't know whether it was a Colt's or Smith & Wesson. Horace and Mr. Williams saw the shooting take place. I don't know where Horace Bluit is. Clifton shot first, he shot twice and I proceeded to crack down on him. I don't know how many times I shot at him. I hit him in the leg twice. He run, I guess, when I shot him. I got the Winchester from Clifton Hafford. I told her her husband sent me after it. He did not tell me that I told that lie to save my life. I knew appellant would shoot me. I don't know whether it is a fact that a 41 pistol will carry a bullet 100 yards or not. The reason I did not go to that woman like a man and tell her that a fellow was going to shoot me and I wanted to get their Winchester was because she would not let me have it. I thought he was going to try to kill me. I thought my life was in danger and still I would not tell the woman why I wanted the gun. I told her a lie to get the gun. I am not going to tell you a lie here. I tell lies sometimes. It is a fact that I am under indictment in this court for having made an assault on Clifton Rogers here with intent to kill and murder him. I don't want to stick him so that he can not testify against me. I don't want to get stuck either. I don't want to see either one of us stuck. I can not say that I want him convicted so that he can not testify against me and get me convicted. Ruth Williams was at her wash place when the shooting took place, right out in front of my house, I was talking to her. She could have seen us two fellows shooting at each other, it was open. Lewis Hafford was in the yard, the mill yard, it was near about the quarters from there. He was a little bit further than fifty yards, I could not say how far it was, it was a little further than fifty yards. I stated that I heard the bullet whistle by my head. I don't know just how close it came to me, but pretty close. It came right along by my ear. I stated he was forty or fifty yards from me at the time he commenced shooting. Clifton and I were just across the street from one another. He followed me up and went in someone's house. He stopped in a house and got a gun. I went in the house and got a gun. He went to my house and there is where the shooting took place. I was not sitting on any stump at the time the shooting took place, nor when the shooting began. I had my face to the defendant when the shooting commenced, he was slipping up on me. He was just walking along and coming on down towards my house and I looked around and saw him, and when I looked around and saw him he pulled out his gun and went to shooting. I did not raise my Winchester and take one or two shots at him before he shot at me, he shot first. I don't know how many shots I fired with the Winchester."

Buster Hafford testified: "I know Buck Neyland and Clifton Rogers. I don't know anything about the shooting between Buck Neyland and Clifton Rogers. I know that Clifton Rogers came to my house and got a pistol. It was a 41, I guess it was a Colt's. It was my pistol. I did not give it to him or loan it to him. It was in the trunk. I reckon that he must have gotten it out of the trunk. As to whether I tried to take it away from Clifton Rogers, will say that I asked him for it and he would not give it to me, I did not do anything then. He went on back up the street. I heard some shooting after that. I don't know exactly how many shots I heard, about four or five. I did not see any of the shooting. I was sitting on the gallery of my house when the shooting took place. This fellow did not keep my pistol very long before he did the shooting with it. I did not give him my permission to take the pistol out of my trunk. I suppose it was about an hour, it was about an hour from the time he took the pistol until he returned it. It was loaded when he took it, and unloaded when I got it back. There were six loads in it and was not any loads in it when I got it back. This shooting took place before 12 o'clock. I went up the street about 100 yards trying to get the pistol. He was not trying to shoot Buck then. I saw Clifton Rogers after he was shot, he was shot in the leg twice. Clifton told me when he went and got the pistol, that he was tired of being run over and wanted the pistol to protect himself, or words to that effect. All of the time that Clifton and I were walking along behind Buck and after I turned him loose he did not make any effort to shoot Buck. I was just talking to Clifton, I don't remember whether I had hold of him or not. I tried to take the gun away from him by asking him for it. I was not trying to take it away from him physically, I could not have taken it away from him that way."

Lewis Hafford testified: "I know Buck Neyland and I know Clifton Rogers. I was in the lumber yard at Bessmay when the shooting took place. I saw the last part of it, I did not see the first part of the shooting. I heard the shooting and I am familiar with the reports of pistols and Winchesters and can tell the difference all right. It was about 12 o'clock. The first shot that was fired sounded like a pistol to me. There were two shots from the pistol before I heard the Winchester. I was about 300 yards from where the shooting took place. I could hear the shooting plainly. The first shot I heard sounded like a pistol shot to me. The Winchester was mine. I was familiar with the sound of the Winchester. I could not swear positive that the first shot that I heard was a pistol shot. I can swear positive that the last shot I heard was a Winchester shot. The first two shots that I heard sounded like pistol shots to me and that is all, they sounded like a pistol to me. I just heard two pistol shots, and if there were six in the pistol and all of them shot, I don't know when they were shot. At the time I saw the shooting I don't know who it was and didn't know who it was that was doing the shooting. I could not tell who was doing it. I don't know who had a Winchester or who had the pistol, I could not tell from where I was."

Ruth Williams testified for defendant: "I know Clifton Rogers and Buck Neyland. I don't know very much about the difficulty that took place between them on the 12th of last May. I was washing and I saw Buck ·Neyland come up back of the fence and he had a Winchester in his hand and he set out there on a stump a good while. I did not say anything to him and he did not say anything to me. After a while I saw Clifton Rogers come out between the two houses and stood there a while and it looked like he was looking over that way, and when I stood there a good little while Buck Neyland raised up and picked the gun up and went to shooting and they got to shooting so rapid that I run in the house. I saw Buck Neyland raise the gun up and go to shooting. Buck Neyland fired the first shot. I did not hear anyone else do any shooting until I heard Buck shoot and he fired over that way. Buck shot twice before Clifton shot. They shot pretty near together. I don't know how many times they shot; I got scared and broke and run. I saw Clifton walk out in front but did not see him shoot; I had my face towards Clifton. The sound I heard after Buck shot came from the direction of where Clifton was. I did not hear any shots or sounds of shots coming from the direction of where Clifton Rogers was until after I had seen Buck Neyland fire.

"I state that the shooting was right close together, almost at the same time, Buck just a little first. It was right close to the same time together. What attracted my attention was him coming up there with the gun and· I saw him looking away across like he was looking for something, and I went to looking to see what he was looking at. After a couple of shots were made I broke and run. I broke and run in the house and shut the door and stayed in there until it was all over, and that is all I know about it."

Appellant did not testify in the case (as he had a right not. to do so) and this leaves us with Buck Neyland's version of the beginning of the trouble alone, and from it appears that the difficulty arose over a game of cards; that appellant left and went and armed himself with a pistol; it appears that subsequently Neyland also left the gambling house, and being informed that appellant had secured a pistol, he went and got a rifle. Neyland then went home; appellant came to, or near Neyland's home. There is no conflict in the testimony so far, but there is a conflict as to which fired the first shot. Neyland says appellant shot at him twice before he fired; in this he is corroborated by Lewis Hafford. Ruth Williams testified that appellant did come to the home of Neyland, but says when he came in sight that Neyland fired first, when appellant returned the fire.

There are no bills of exceptions, and the first ground in the motion reads: "Because the court erred to the prejudice of this defendant in failing and refusing to instruct the jury in the charge given as to the whole law relative to provoking a difficulty in that the court charged the law applicable in case the evidence showed that the defendant provoked the contest or difficulty with said Buck Neyland with the intent

to kill him, said Neyland, but wholly failed and refused to instruct the jury as to the law if the contest or difficulty was provoked by defendant with no intention to kill said Neyland." By the testimony above copied it is seen this complaint has no foundation in the evidence. If appellant provoked the difficulty, and the jury so found, the evidence raised no issue that he did so with any other intent than to kill. One used a 41-calibre pistol, the other a rifle, both being deadly weapons, and article 51 of the Penal Code provides that the intention to commit an offense is presumed whenever the means used is such as would ordinarily result in the commission of the forbidden offense, and this court has held that this presumption always obtains when the consequences of the act are the necessary or even probable result therefrom. McCoy v. State, 25 Texas, 33; High v. State, 26 Texas Crim. App., 545; Wood v. State, 27 Texas Crim. App., 393; Hatton v. State, 31 Texas Crim. Rep., 586; Shaw v. State, 34 Texas Crim. Rep., 435. While it is never proper to give this article in charge to the jury, yet in passing on the record this rule of law is placed in the Code for our guidance, and when one secures a deadly weapon, after a difficulty, follows another to his home, the necessarily and probable result is there will be trouble, and if trouble does ensue and he uses the pistol, no intention other than to kill can be presumed or inferred from such acts, and in this record there is no suggestion that appellant had any other intent than to kill when he fired the shot.

The second ground in the motion is: "Because the court erred to the prejudice of this defendant in failing and refusing to charge the law that in case said Neyland had been killed by said defendant, and such killing had been done under conditions that would have made the homicide manslaughter and not murder, then defendant could not be found guilty of the offense charged in the indictment, but may have been guilty of some other offense." There is no evidence that appellant went to Neyland's home to adjust the difficulty; but he secured a pistol, went to his adversary's home, and when they came in sight of each other, the shooting began. There is nothing in the record to suggest an adequate cause to reduce the offense to manslaughter, had death ensued.

The third ground reads: "Because the court erred to the prejudice of this defendant in that it failed and refused to charge the law of aggravated assault, and in failing and refusing to properly instruct the jury as to the conditions under which the jury could and should find the defendant not guilty of assault with intent to murder but should find him guilty of aggravated assault or of an offense of a lower degree." There is no evidence, as shown above, calling for a charge on aggravated assault. Appellant was guilty of assault to murder or no offense.

That ground in the motion complaining of the insufficiency of the evidence is without merit as shown by the testimony herein copied, and the only other ground in the motion reads: "Because the court erred to the prejudice of the defendant in charging the law as to provoking a difficulty, for the reason that the evidence showed that if defendant

had provoked a difficulty, that said difficulty was past, and that at the time the shooting took place there is no evidence that defendant in any manner provoked, or attempted to provoke a difficulty." It·is seen this ground seeks to point out no error in the charge on provoking the difficulty, but simply and only complains that the court erred in submitting that issue to the jury. Our decisions hold that circumstantial evidence may be cogent enough to authorize a charge on provoking the difficulty. In Tate v. State, 35 Texas Crim. Rep., 231, this question is discussed at length, and in a case where the evidence on provoking the difficulty is weaker than in this case, this court held there was no error in submitting that issue, although the defendant testified his intention in going to decedent's place of work was to adjust matters, but the court says from the circumstances in the case, the jury was authorized to find otherwise, and the court did not err in submitting the issue. In this case appellant has an altercation with a man; goes and gets a pistol, says he is tired of being run over, proceeds to the home of the man with whom he had the altercation, and for what purpose? He is silent as to his purpose, but the facts and circumstances all point to the fact that he went there to engage in a deadly affray; at least, would raise the issue sufficiently to authorize the court to submit the issue to the jury. In section 1181 of White's Ann. P. C., the rule is stated to be: Adjudicated cases hold among the slayer's acts, which abridge his right of self-defense, the following: 1. Devices, by language or otherwise, to provoke the deceased to make an assault which will furnish a pretext for taking his life or inflicting serious bodily injury upon him. 2. Provocation of the deceased into a quarrel causing the fatal affray. 3. Preconcert with deceased to fight him with deadly weapons. 4. Commencing an assault upon the deceased. 5. Going with a deadly weapon where deceased is for the purpose of provoking a difficulty; and by acts or words, making some demonstration of such purpose calculated to provoke the deceased. Cartwright v. State, 14 Texas Crim. App., 486; Cunningham v. State, 17 Texas Crim. App., 89; Jones v. State, 17 Texas Crim. App., 602; Allen v. State, 24 Texas Crim. App., 216; Ball v. State, 29 Texas Crim. App., 107; Milrainey v. State, 33 Texas Crim. Rep., 577; Thumm v. State, 24 Texas Crim. App., 667; Meuly v. State, 26 Texas Crim. App., 274; Bonnard v. State, 25 Texas Crim. App., 173; Johnson v. State, 26 Texas Crim. App., 631; Sullivan v. State, 31 Texas Crim. Rep., 486; Jackson v. State, 32 Texas Crim. Rep., 192; Powell v. State, 32 Texas Crim. Rep., 230; Mathis v. State, 34 Texas Crim. Rep., 39; Burris v. State, 34 Texas Crim. Rep., 387; Plew v. State, 35 S. W. Rep., 366. See also cases cited in sec. 1183 of White's Ann. P. C. In the case of Thumm v. State, 24 Texas Crim. App., 667, this court, speaking through Judge Willson, says:

"To one who brings on an affray or who prepares himself for an encounter in which he intends to wreak his malice, the plea of self-defense is not available, though his own life be imperiled in the affray. If a person by his own wrongful act brings about the necessity of taking the

life of another, to prevent being himself killed, he can not say that such killing was in his necessary self-defense. A person can not avail himself of a necessity which he has knowingly and wilfully brought upon himself. (Willson's Texas Crim. Laws, sec. 981.) If a person voluntarily engage in a combat, knowing that it will or may result in death, or some serious bodily injury which may produce the death of his adversary or himself, he can not claim that he is acting in self-defense."

This has always been the rule in this court and under the evidence herein copied we think it apparent, beyond the peradventure of a doubt, the court did not err in submitting it to the jury for their determination, and the court instructed the jury that, if they did not find beyond a reasonable doubt that defendant provoked the difficulty with the intention and purpose to kill Neyland, his right of self-defense would not be impaired, and charged them:

"Upon the law of self-defense you are instructed that if from the acts of the said Buck Neyland, or from his words coupled with his acts, there was created in the mind of the defendant a reasonable apprehension that he (the defendant) was in danger of losing his life or of suffering serious bodily injury at the hands of said Buck Neyland, then the defendant had the right to defend himself from such danger or apparent danger; and it is not necessary to the right of self-defense that the danger should in fact exist, but if it reasonably appeared to the defendant, at the time, viewed from his standpoint, that such danger existed, he would have the same right to defend against it that he would have were the danger real. And a party so unlawfully attacked is not bound to retreat in order to avoid the necessity of killing his assailant.

"If you believe that the defendant committed the assault as a means of defense, believing at the time he did so (if he did so) that he was in danger of losing his life or of serious bodily injury at the hands of said Buck Neyland or if the said Neyland had shot him with a Winchester, then you will acquit the defendant, and say by your verdict 'not guilty.'" This presented the matter as favorably to defendant as the evidence justified. We are of the opinion that the evidence was of that cogency and force to authorize the submission of the issue of provoking the difficulty, to the jury. When the evidence shows that one gets angry with another, goes and gets a pistol, and goes to the home of the person with whom he had a difficulty, coming up between two houses with the pistol in his hand, it is extremely doubtful if the court should have submitted the issue of self-defense at all; but if he does do so, and then in connection therewith he tells the jury if they believe under the facts and circumstances that such acts were done with the intention to kill his adversary he could not claim self-defense, but if by his acts and conduct the jury did not find beyond a reasonable doubt such was his intention, his right of self-defense would not be impaired, and if Neyland fired first, or it reasonably appeared to him that his life was in danger, to acquit, the case is presented in a way he can not complain.

The judgment is affirmed.                                *Affirmed.*

DAVIDSON, Presiding Judge (dissenting).—In dissenting I do not care to make a statement of the case, it being, I think, sufficiently stated by Judge Harper. Under the statement made in the majority opinion the evidence excludes the idea that the issue of provoking the difficulty was in the case. Appellant had the right of self-defense in the case untrammeled by the issue of provoking the difficulty if his or the State's evidence be correct. As I understand the facts stated, if the question of provoking the difficulty is in the case at all, it is by reason of the fact appellant armed himself and followed Neyland until there was an opportunity to shoot, and as soon as he was in shooting distance of Neyland began shooting. This does not raise the issue of provoking the difficulty. If he armed himself for the purpose of shooting Neyland, and as soon as he got within reach began shooting, the issue of provoking the difficulty could not be in the case. If he armed himself intending to resist an attack by Neyland, his right of self-defense should not have been trammeled by the issue of provoking the difficulty. It was either an unprovoked assault on his part for the purpose of killing Neyland, or he acted in justifiable self-defense. Under either view of the case from the testimony the issue of provoking the difficulty could not be in the case. The State's evidence makes appellant the attacking party. He did not undertake to provoke Neyland to shoot but simply followed and shot at him after arming himself for that purpose. The unquestioned rule in Texas is thus stated by Mr. Branch in his Criminal Law of Texas, section 464: "If he (the slayer) provoked the combat or produced the occasion in order to have a pretext for killing his adversary, or doing him great bodily harm, the killing would be murder, no matter to what extremity he may have been reduced in the combat." Cunningham v. State, 17 Texas Crim. App., 95; Thuston v. State, 21 Texas Crim. App., 248; Keeton v. State, 128 S. W. Rep., 413; Arto v. State, 19 Texas Crim. App., 136; Roach v. State, 21 Texas Crim. App., 254, 17 S. W. Rep., 464; Thumm v. State, 24 Texas Crim. App., 703, 7 S. W. Rep., 236; Puryear v. State, 56 Texas Crim. Rep., 238, 118 S. W. Rep., 1042; Johnson v. State, 26 Texas Crim. App., 631, 10 S. W. Rep., 235; Allen v. State, 24 Texas Crim. App., 224, 6 S. W. Rep., 187; Green v. State, 12 Texas Crim. App., 449; Cartwright v. State, 14 Texas Crim. App., 486; Crist v. State, 21 Texas Crim. App., 367, 17 S. W. Rep., 260; Warren v. State, 31 Texas Crim. Rep., 573, 21 S. W. Rep., 680. This would be provoking the difficulty, and would be a limitation upon his right of self-defense, but the converse of the rule is equally clear that it was error to charge on provoking the difficulty when the evidence does not raise the issue. See authorities collated by Mr. Branch in his work on Criminal Law, section 466, where a great number of the cases are collated. If the State's case is an unprovoked homicide, and defendant's case is perfect self-defense, the issue of provoking a difficulty is not in the case. Beginning a difficulty is not provoking one. Casner v. State, 43 Texas Crim. Rep., 12; Dent v. State, 46 Texas Crim. Rep., 173; Carr v. State, 48 Texas Crim. Rep., 288; Roberts v.

State, 48 Texas Crim. Rep., 380; Reese v. State, 49 Texas Crim. Rep., 243; Lockhart v. State, 53 Texas Crim. Rep., 595, and for further cases see section 466, supra.

Again it is well stated as the rule that if the only question involved is, who made the first attack, provoking the difficulty is not in the case. Casner v. State, 43 Texas Crim. Rep., 12; Pollard v. State, 45 Texas Crim. Rep., 121; Reese v. State, 49 Texas Crim. Rep., 243; McCandles v. State, 42 Texas Crim. Rep., 61; McMahon v. State, 46 Texas Crim. Rep., 549; White v. State, 42 Texas Crim. Rep., 570. If the deceased was the aggressor and began the difficulty, it was error to charge on provoking the difficulty. Jones v. State, 17 Texas Crim. App., 611; Dent v. State, 46 Texas Crim. Rep., 173; Crowson v. State, 51 Texas Crim. Rep., 14.

Again, it is stated as a proposition supported by the authorities, that going to a place, though armed, will not of itself deprive a defendant of the right of self-defense, and, therefore, provoking the difficulty would not be in the case. Grayson v. State, 57 S. W. Rep., 809; Hall v. State, 42 Texas Crim. Rep., 449; Shannon v. State, 35 Texas Crim. Rep., 6; Crow v. State, 48 Texas Crim. Rep., 421; Cartwright v. State, 48 Texas Crim. Rep., 502.

It is unnecessary to pursue this thought further. Under the evidence the issue of provoking the difficulty was not raised by the evidence, and appellant's right of self-defense was improperly limited by a charge on provoking the difficulty. As before stated, this was a case in which either the defendant intentionally went to where Neyland was for the purpose of killing him and proceeded to shoot at him, or it was an attack by Neyland upon him when he had done nothing to provoke him to the difficulty, and justified him in firing upon Neyland. The issue was not provoking the difficulty but the issue was who was the attacking party. Under such circumstances the limitation of provoking the difficulty should not have limited the right of self-defense. I therefore respectfully enter my dissent.