## J. H. DENT v. THE STATE.

### No. 2931.   Decided March 9, 1904.

**1.—Bills of Exception—Filing Back—Practice.**

The necessity of complying with the rule of practice requiring bills of exception to be presented and filed within the time prescribed by law is emphasized and the practice of filing bills back within the term is reprobated as an evasion of the established rule, and if connived at by appellant would cause the bills to be stricken out, otherwise it would be ground for reversal.

**2.—Provoking Difficulty—Self-Defense.**

Before the trial court is authorized to limit or cut off the right of self-defense, by a charge on provoking the difficulty he should be able to lay his hand on the facts which would authorize such a charge.

**3.—Same—Manslaughter.**

Where the deceased not only made the first actual assault, but the first aggressive movement toward appellant, and the latter when staggering to his feet from the blow he had received from deceased made the fatal assault upon the deceased, there does not appear any demonstration on the part of the appellant from which it could be said that he provoked the difficulty, and was thus cut off or limited in his right to a charge on manslaughter.

**4.—Murder—Burden of Proof.**

Where the facts showed that appellant had been knocked down and dazed by a blow from the deceased, and while in such condition was probably irresponsible for his fatal thrust with a knife which killed deceased, it was error on part of the court to charge that the burden of proof was upon appellant to show by a preponderance of the evidence such mental incapacity.

**5.—Charge of Court—Perfect Right of Self-Defense.**

Where the evidence showed that the deceased suddenly sprang in front of appellant in a threatening attitude and created in the mind of appellant a reasonable belief that he was about to make an attack upon him, appellant raising his hand to ward off the blow, when deceased knocked him down, the appellant had the right to act in perfect self-defense and it was error for the court to charge that such right only arose out of appellant's mental irresponsibility from such blow and that the burden was upon him to show this.

**6.—Same—Mental Condition Arising in Difficulty.**

If deceased himself, by his aggression, and on account of his assault, dazed appellant, rendering him unconscious and incapable of understanding and knowing right and wrong of his actions, this condition springs out of and inheres in the case and defendant was entitled to a reasonable doubt on the subject, and it did not shift the burden of proof upon him to prove by a preponderance of the evidence his mental condition as an independent matter of defense not arising out of the res gestae.

**7.—Same—Manslaughter.**

See opinion for state of facts which reduced the homicide to manslaughter, if defendant was guilty of any offense.

Appeal from the District Court of Tarrant.   Tried below before Hon. M. E. Smith.

Appeal from a conviction of murder in the second degree; penalty, imprisonment for a term of forty-nine years in the penitentiary.

The opinion states the case.

*Parker & Parker,* for appellant.—The issue of provoking the difficulty not being raised by the evidence, the court erred in submitting same to the jury.   Cook v. State, 2 Texas Ct. Rep., 991; Thomas v.

State, 34 Texas Crim. Rep., 481; Casner v. State, 2 Texas Ct. Rep., 559; White v. State, 32 S. W. Rep., 575; Wrage v. State, 54 S. W. Rep., 602; Airhart v. State, 51 S. W. Rep., 214; Mozee v. State, 51 S. W. Rep., 250; Abram v. State, 35 S. W. Rep., 389.

The court in its charge places the burden on defendant to establish by a preponderance of the evidence as a fact that at the time he struck the fatal blow he was in an unconscious and irresponsible condition as the result of a blow inflicted by the deceased on him, and that same dethroned his reason to such an extent that he was unable to and did not comprehend and understand the nature and character of the act he was committing. I don't believe this to be a correct proposition in any case. If, however, we concede it to be correct as a proposition of law, it could certainly have no application to this case, for the reason that all the evidence for both the State and defendant raises the issue of defendant's unconscious and irresponsible condition of mind; and in such cases the burden of proving that fact is not upon the defendant, but upon the State. Jones v. State, 13 Texas Crim. App., 1.

When perfect and imperfect self-defense and manslaughter are raised by the evidence, it is incumbent upon the court to define and submit the same to the jury affirmatively for defendant, and to apply the facts to each. Cartwright v. State, 14 Texas Crim. App., 486; Parker v. State, 18 Texas Crim. App., 72.

*Howard Martin,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of forty-nine years; hence this appeal.

The homicide for which appellant was convicted occurred on the 30th of June, 1902, in the lodge room of the Woodmen of the World, at the little town of Azle. The occasion was a lodge meeting, and the difficulty grew out of the trial of the appellant on a charge of attempting to give away the pass word of the order, deceased being the most important witness against appellant. It appears that during the trial of appellant, before the lodge, while Wilson (deceased) was testifying to the effect that appellant gave him a piece of paper with some word written on it (which it seems was not really the pass word), appellant interrupted and said to deceased, that was not so. Deceased said, "We will settle that later;" and the defendant said, "Yes, you will have to fix it." After the evidence was adduced before the lodge, appellant was retired to the anteroom, while the vote was being taken. While there, Henry Jefferson, witness for the State, relates that appellant said to him, "What was the matter with J. B. Wilson?" To which he replied "Nothing." Defendant then said, "Yes there is; he has sworn a lie on me in there, and I am going to give him a piece of my barlow." After the vote was taken, which resulted in the expulsion of appellant, he was brought

before the lodge and received his sentence. Shortly after this the lodge adjourned, and the members began going out of the lodgeroom through the anteroom to the stairway on their way home. Henry Jefferson, who was the strongest witness for the State, relates what occurred immediately connected with the homicide substantially as follows: That he and deceased, with some others, were in the anteroom. Appellant was then in the lodgeroom. About this time appellant's father, who had gotten to the outer door of the anteroom, said, "Come on, boys; it's getting late; let's go home." Defendant replied "What's the use of being in a hurry?" That at the time he was with deceased in the anteroom and said to him, "Keep your eyes open." That he then stepped back in the lodgeroom, right beside defendant; that as he stepped up by the side of defendant, deceased jumped in the lodgeroom from the anteroom, in front of defendant, and said, "Bud, if you are going to stick that knife in me, stick it in me here." (Defendant at the time having a knife in his hand.) "About that time I saw defendant throw his left arm up in front of his face, and as he did that raised his right hand with his knife in it as if to strike, having changed the knife in his hand from ordinary cutting position to stabbing position." That he grabbed appellant's right arm, and in the scuffle deceased knocked defendant down somewhere near the east door that leads in from the anteroom. Defendant's head hit the side of the wall or floor. When deceased knocked defendant down he stepped back. When defendant got up he came in a stooped position toward deceased, and cut him with his knife. All of the witnesses for the State testify in effect that, after the adjournment of the lodge the parties were going from the lodgeroom through the anteroom, out into the hall to the stairway, on their way home; and witness Henry Jefferson and deceased preceded defendant to the anteroom; defendant being at the time behind in the lodgeroom; that Jefferson reurned from the anteroom into the lodgeroom and stopped close by defendant; that almost immediately deceased sprang or jumped from the anteroom into the lodgeroom, and stepped right in front of defendant and told him if he was going to cut him, to cut him then. Some of the witnesses say that appellant raised one or both hands at this. Some of them did not see any demonstration whatever, but say that as soon as deceased sprang in front of appellant and accosted him, that he then knocked him down; that appellant then staggered to his feet and rushed at deceased, who in the meantime was backing off towards the east wall of the lodgeroom, and stabbed him in the neck with the knife, which almost immediately caused his death. One witness, perhaps, for the State says that when deceased jumped in front of appellant, appellant appeared to advance toward him with his knife in his hand. Deceased then knocked appellant down. A number of witnesses also stated that immediately, appellant's father, who had returned to the lodgeroom, remarked to his son, "Bud, what did you do that for?" and appellant replied, "Because he knocked me down."

The State also proved that during the trial of appellant in the lodgeroom, he had his knife open in his hand pretty much all the time; and one witness (Jefferson) states that when he went into the anteroom, while appellant was waiting for the vote, he saw appellant whetting his knife on the window sill. The knife was a barlow. One witness also testified as to a threat made by appellant against deceased the evening before, to wit, that he said if Wilson swore that he tried to give away the pass word he would hang a chair over his head. Appellant's testimony agreed substantially with the testimony introduced by the State as to what preceded the difficulty. However, in connection with giving away the pass word, it was shown that appellant could not write, and consequently could not have written the word on the slip of paper and handed it to deceased Wilson as testified to by him; that when deceased testified against him that he got up in open lodge and told the commander, and those present, that what deceased said was not true; that deceased replied, "All right; I will fix you after the lodge is over." Appellant responded "All right." That deceased was angry at the time, and it made defendant angry for deceased to swear a lie on him in the lodgeroom. That his having his knife out during the meeting of the lodge was simply a habit, and that he was not doing anything unusual with it. That when Jefferson came to the anteroom he told Jefferson deceased had swore a lie against him in the lodgeroom, and that if he monkeyed with him he was going to give him a piece of his barlow; that after he was brought from the anteroom and sentence pronounced on him, he took a seat on the west side of the lodgeroom, and directly the lodge adjourned. That when it did so, he started to go out of the lodgeroom home, but just before getting to the door of the anteroom, deceased passed by him, and if he wanted to he could have cut him, but did not want any trouble with him; that deceased passed by, and appellant stopped and waited for him to go down stairs and get away. While appellant was standing there, all at once Henry Jefferson came out of the anteroom, and stepped up by the side of appellant, and immediately deceased jumped in front of him with his fist drawn up in a threatening attitude, and said "if I wanted to stick that knife in him, to stick it in him then." Appellant replied he did not want to stick the knife in him. As soon as he said that, deceased made a motion as if to strike. Appellant threw his right hand up to ward off the blow, having his knife at the time in his left hand. That immediately deceased knocked him down; that his head hit the floor, and he fell flat on his back. After he was knocked down he did not know what he did; that the blow rendered him unconscious; that he was dazed. The first thing he remembered was when his father came to him, and said, "But, what in the world did you do that for?" That he did not know what his father meant, and asked him what he had done, and he told him he had either cut or killed J. B. Wilson; that he told his father he did not remember that he had done anything.

His father and other witnesses corroborated him as to his reply to his father when he asked him what he did that for. Appellant further stated that deceased was a larger man than he, about 35 years of age, and had the reputation of being a dangerous man; that he was afraid of him, and that was the reason he stopped in the lodgeroom, in order to let him get down stairs and get away; that he believed deceased was going to attack him from what he said in the lodgeroom. That when Henry Jefferson stepped by his side in the lodgeroom and deceased stepped in front of him, he was not doing anything to anyone and made no effort to harm anybody. There were no lights in the anteroom, and he could not see Wilson after he left the lodgeroom and went into the anteroom; that the lights in the lodgeroom were dim, and he could not tell whether deceased had anything in his hand or not. It was done quickly. He also testified that when his father, who was at the outer door of the anteroom and said, "Come on boys, let's go home," he replied, "What's the use of being in a hurry," and he kept standing on there, waiting for Wilson to leave. This witness also denied telling Henry Crosby on the evening before the difficulty, that if deceased swore a lie on him he was going to break a chair on his head. This witness also denied attempting to give away the pass word of the lodge. That after he was expelled he felt like he was disgraced and ruined; that he did not at any time intend to attack Wilson; that all he wanted was for him to let him alone, and did not make any attempt to cut or injure Wilson, before Wilson knocked him down. It was also shown in proof that appellant was 19 years old. Glover, witness for the State, testified that he saw Wilson, deceased, on Sunday before the killing, and Wilson said to him, "Dent's folks have got it in for me, and I am going to the lodge, and I am going with my fighting clothes on." It was further in proof that until this lodge matter came up the relations between deceased and appellant were friendly, and it was shown that on the evening before the lodge meeting they were seen talking together in a friendly manner. This is a sufficient statement of the facts in order to discuss the issues presented in the case.

The term of the court adjourned on January 10, 1903, and the bills of exception, some eight or nine in number, bear the file mark of January 9, 1903. Appellant and his attorneys, Messrs. Parker and Roy, make affidavit to the effect that during the term they prepared some fourteen bills of exception, and before the adjournment of the term, in the presence of the county attorney, O. S. Lattimore, Esq., presented the same to the judge for approval, so they might be filed. That the county attorney made objections to the bills; that they were not correct; that they could not agree, and insisted on the judge making such corrections as he chose and file the same during the term. It was suggested that the judge and the county attorney might take the bills and correct them and file them back as of the term; but counsel for appellant show they did not agree to this course, insisting on the bills being corrected and filed then. The district judge's affidavit in this regard agrees sub-

stantially with the affidavit of appellant's counsel, stating, as follows: "The county attorney objected to the bills, and stated that he would take them and prepare correct ones, or ones that he deemed correct. Mr. Parker expressed his unwillingness to agree that the bills might be filed back. I suggested that I thought the county attorney would not take advantage on that ground. Mr. Parker then said in substance that he did not wish to be understood as intimating that the county attorney would take any such advantage, but that he was not willing to make an agreement whereby his client might be placed at such a disadvantage in the appellate court. The county attorney then took the bills, with the statement in effect on his part and my part that they would be filed back. My belief was at the time that Mr. Parker declined to consent to this arrangement, more as a saving clause than from an unwillingness that the bills might be so filed, and from this I concluded it would be satisfactory to all concerned if the bills were so prepared and filed; and for this reason the county attorney was permitted to take the bills." There were also affidavits of appellant's counsel to the effect that the bills filed long after the term adjourned are not the bills prepared by them, but entirely new bills, evidently prepared by the county attorney; and only eight in number when he had at least fourteen bills. That he preserved no copy of the bills of exception and could not substitute them. O. S. Lattimore, Esq., county attorney, and R. H. Buck, Esq., his assistant, filed controverting affidavits stating that the bills produced by appellant's counsel were in all sixteen in number; that they were grossly incorrect; that he refused to agree to them, and stated to the court that he would take said bills and prepare correct ones if it was the court's wish; that the court agreed to this, and so did the attorneys, stipulating only that such bills should be filed back as of that date, to which affiant agreed; that the court had neither time nor opportunity on said date to examine and rewrite said lengthy bills before the adjournment; that said bills were lost for a time, but were subsequently found by R. H. Buck, Esq., and at once carried to the judge, who took them, and of his own suggestion, and not in the presence of affiant, prepared said bills of exception as they appear in the record and filed them as of date in said September term, 1902. He further states that he thereupon asked appellant's attorneys why he desired to retain said affidavit in the record, and W. R. Parker, Esq., of counsel for appellant, said he would withdraw it if counsel for the State would agree to have filed the bills as originally presented. This affiant declined. We would state that these affidavits emphasize the necessity of complying with the rule of practice prescribed requiring bills to be presented and filed within the time prescribed by law. A disregard of the plain provisions of the law on this subject, or an evasion of the same by filing bills back within the term, can only result in such confusion and antagonism as is here manifested. This court has more than once reprobated such practice and reversed cases. This

practice, if connived at by appellant, would cause the bills to be stricken out; but if done without his connivance or agreement would afford ground for reversing the case. However, it is not necessary to pass on that question here, inasmuch as the motion for new trial, which was filed in term time, presents in itself ample ground for the reversal of the case.

Appellant complains of the court's charge on manslaughter, insisting it is too restrictive, in that the court limited same by a charge on provoking the difficulty. The paragraph in substance (number 14) instructed the jury that if appellant stabbed deceased, and at the time there existed in his mind a degree of anger, rage, resentment or terror, rendering him incapable of cool reflection, and that such condition was produced by an adequate cause, as before defined, and that the killing was neither justifiable nor excusable; and you do not find that appellant "provoked the difficulty under subsequent instructions herein, with the intent to take the life of deceased, or to inflict upon him serious bodily harm, then you will find defendant guilty of manslaughter," etc. Appellant's contention being that there was no evidence in the case raising the issue of provoking the difficulty. This court has repeatedly held that before the judge is authorized to limit or cut off the right of self-defense, by a charge on provoking the difficulty, the court ought to be able to lay his hand on the facts which would authorize such a charge. See Cartwright v. State, 14 Texas Crim. App., 486; Morgan v. State, 34 Texas Crim. Rep., 222; McCandless v. State, 42 Texas Crim. Rep., 58. The same principle of course will apply when by a charge the court proposes to cut off and deny to a defendant his rights under a plea of manslaughter as against the charge of murder. Now, what facts appear in this record which authorized the court to limit appellant's defense of manslaughter as against the charge of murder? Of course, if the learned judge who submitted the case was able to point out any fact or facts which even tended to raise the issue of provoking the difficulty, the charge on the subject of provoking the difficulty might be sustained. It is true that deceased not only made the first actual assault, but he made the first aggressive movement toward appellant. What act authorized or provoked him to do this? On this subject the record shows that some time before the rencounter deceased and appellant had some words in the lodgeroom; that is, defendant told him what he stated about his giving away the pass word was not true. Deceased replied, according to State's witnesses, "We will settle that later;" and the defendant said "Yes, you will have to fix it." This occurred some time before the actual difficulty. If the rencounter had occurred at the time, there might be some color for the charge, but what took place subsequently must be governed by the circumstances then occurring. Threats aside (which cut no figure, as they are not shown to have been communicated to deceased), nothing occurred between the parties until

after the adjournment of the lodge. Then it appears that all were proceeding from the lodge on their way to their respective homes. Deceased and his companion Jefferson had evidently preceded appellant. According to the State's witnesses they were ahead of him, having passed into the anteroom. According to appellant's witnesses they passed him on their way out. They appeared to have paused in the anteroom. Jefferson first returns to the side of appellant, who had stopped in the lodgeroom, as he says, to allow deceased to pass out ahead of him. Immediately after Jefferson took his stand by appellant, deceased jumped or sprang suddenly into the lodgeroom from the anteroom, confronted appellant, and dared him to cut him. If appellant made any demonstration at that time, which some of the witnesses state, and he himself admits that he did raise his hands as if to ward off a blow, this could not be called provoking the difficulty. Deceased was not only the aggressor in rushing upon appellant, but he immediately knocked him down, and it was only after appellant staggered to his feet that he made any assault on deceased. We fail to see in these facts any act or demonstration on the part of appellant, from which it could be said that he provoked deceased to return from the anteroom and begin the difficulty. Of course, we make these remarks from the State's standpoint. If we look to the defendant's testimony there was an evident endeavor to avoid a difficulty with deceased. We do not believe the court was justified in charging on provoking the difficulty at all, much less in coupling with almost every charge in favor of defendant an instruction cutting off his rights on the ground that he provoked the difficulty.

What has been said above is applicable to the sixteenth paragraph of the court's charge, and also to the seventeenth and eighteenth paragraphs.

In the nineteenth paragraph of the charge, this language is used: "If defendant did not provoke the contest under 16 or 17 (paragraphs) of the charge, but you find that deceased placed himself suddenly in front of defendant in a theatening attitude and in a position to make an unlawful attack upon him, and his conduct in so doing was reasonably calculated to create in the mind of defendant the belief that deceased was about to make an attack upon him, and acting upon such belief he advanced upon deceased, with no intention of killing him, but only for the purpose of warding off such attack or apparent attack, if any, and that while advancing he was struck and knocked down by deceased, and you believe that the force of the blow dethroned defendant's reason, and rendered him unconscious and irresponsible and while laboring under such unconsciousness and irresponsible condition of mind, he struck the fatal blow and that at the time said blow was inflicted by him, by reason of such unconscious condition he was unable to and did not comprehend and understand the nature of the act he was committing, then you will acquit him. On the issue as to whether the defendant was at the time

laboring under mental incapacity to understand and comprehend the nature and character of the act, as last above explained, the burden of proof is on the defendant to show by a preponderance of the evidence such mental incapacity." This was objected to on the ground that, in the first portion of the charge, the court should have instructed an acquittal on the ground of self-defense; but instead thereof, he coupled appellant's right to slay with the proposition that the blow dazed him, rendering him incapable of understanding the nature and character of his act. And the court further cast the burden on appellant that he was so rendered unconscious and incapable of comprehending the nature of the act he was committing, by requiring him to prove this by a preponderance of the evidence. Unquestionably, if appellant did not provoke the contest, and the deceased suddenly sprang in front of appellant in a threatening attitude, and created in the mind of appellant a reasonable belief that he was about to make an attack upon him; and appellant only advanced toward deceased and raised his arm for the purpose of warding off such attack or apparent attack, and deceased then knocked him down, it occurs to us appellant would have had the right to act in his perfect self-defense; and if he believed his life in danger or his person in danger of serious bodily harm, the killing of deceased, under such circumstances would be justifiable homicide. But the court couples this charge, as stated above, with the further proposition that appellant must have been stunned and rendered unconscious by the blow to such an extent as that he was not able to understand and know the character of the act he was doing, before he would be authorized to act; and the court further requires that appellant must show his dazed and unconscious condition by a preponderance of the evidence, before he could act in his self-defense. This charge evidently was erroneous from start to finish, and not only denied him the right of self-defense under such circumstances, but required him to prove his unconscious condition by a preponderance of the evidence. We do not understand this character of testimony to be governed by the rules regulating the plea of insanity. If deceased himself, by his aggression, and on account of his assault, dazed appellant, rendering him unconscious and incapable of understanding and knowing the right and wrong of his actions, this condition springs out of and inheres in the case; and appellant was entitled to a reasonable doubt on the subject. We are aware that the generally received doctrine is that, where defendant sets up an entirely independent defense, and attempts to prove extrinsic facts, not arising out of the res gestæ, such as license to do an act, jeopardy, compulsion, negligence of attendants, and insanity, the burden rests upon the defendant to establish such defenses. In this State the rule with reference to the defense of insanity as a general proposition is, that the burden is on the defendant to show this by a preponderance of the evidence; but in all these cases the condition of the mind of the party charged with the offense

did not arise during the struggle, but was an independent fact. See Webb v. State, 5 Texas Crim. App., 596; 9 Texas Crim. App., 490; Leach v. State, 22 Texas Crim. App., 279; Burt v. State, 38 Texas Crim. Rep., 397. But this doctrine has never been extended to some state or condition brought about or caused during the difficulty. In a case of homicide, it is the duty of the State to place the whole case before the jury; that is, the entire res gestæ must be presented. But if some of the matters pertaining to the difficulty are omitted, the defendant introduces this, then no matter by whom the facts attending the difficulty are introduced, if upon a consideration of these a reasonable doubt exists as to the guilt of the party, he should be acquitted. This rule includes all matters of defense growing out of the res gestæ which traverses the allegations of the indictment; and it is only when defendant sets up independent matters of defense, or matters in avoidance of the indictment, that a different rule of evidence prevails. The defendant is not required to prove any of the circumstances attending the difficulty, beyond a reasonable doubt; but is only required to prove the same as any other facts are required to be proved; and if the matters relied on be supported by such proof as would produce a reasonable doubt in the minds of the jury as to the prisoner's guilt, when the whole evidence comes to be considered by them, they must acquit. Kent v. People (Colo.), 9 West Coast Rep., 584. In Jones v. State, 13 Texas Crim. App., 1, the same rule is announced. We quote from that opinion, as follows: "When a defendant pleads not guilty, and does not rely upon any matter as a defense which is separate and distinct from and independent of the facts constituting the offense, the burden of proof does not rest upon him to prove anything, and in such case it would be error to give any charge to the jury. Article 51, Penal Code (now article 52). Thus, if the defendant is accused of murder or of an assault, and pleads not guilty to the charge, the burden of proof is not upon him to prove self-defense or accident, or want of evil intent, or any other defensive fact which is immediately connected with and constitutes a part of the transaction, *and which is not peculiarly within the knowledge of the defendant.* This is so because the burden of proof is upon the State to prove that the homicide was unlawful and intentional and committed with the necessary criminal intent; and until this proof is made to the exclusion of a reasonable doubt, the defendant is shielded by the presumption of innocence and is not required to prove anything." Here we have a state of mind, as testified to by appellant, that was caused during the difficulty by a blow from the deceased which felled him to the floor, and which for the time being dazed him, and rendered him unconscious and incapable of knowing and understanding the nature of his acts. This arose during the difficulty, and was occasioned directly by deceased; and was a part of the res gestæ of the State's case. Under such circumstances to require him to assume the burden of proof, and establish his condition *beyond a*

*reasonable doubt,* would be placing an undue burden upon him, and one not authorized by the law. Ake v. State, 6 Texas Crim. App., 398; Dubose v. State, 10 Texas Crim. App., 230.

Looking through this whole record we do not believe appellant has had that fair and impartial trial which the law guarantees him. A perusal of the testimony fails to show that appellant provoked the difficulty, yet this matter of provocation was coupled with almost every charge given in favor of defendant; and it evidently handicapped him throughout the trial. Even if it be conceded that the State was entitled to a charge on provoking the difficulty, such an instruction should not have permeated the whole charge as is here manifested. But, as has been stated, the testimony fails to raise the issue of provoking the difficulty, and appellant was entitled to a full and fair charge on the subject of self-defense. It occurs to us if appellant was guilty of any offense it was of no higher grade than manslaughter.

For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*