## FRANK LEITO v. THE STATE.

### No. 3381.  Decided February 7, 1906.

#### 1.—Murder in Second Degree—Threats—Charge of Court.

Where upon trial for murder the evidence showed that on the night of the homicide deceased was drinking, cursing and displaying a pistol about a saloon, saying that he was going to get some damned son-of-a-bitch· in that place before morning, and that defendant was informed of this threat.  Held that the same was too general a declaration on which to predicate a charge on threats.

#### 2.—Same—Accidental Killing—Negligent Treatment of Physician.

See opinion holding that the evidence did not suggest the issue of an accidental killing and did not authorize a charge on negligent treatment of his physician.

#### 3.—Same—Provoking Difficulty—Charge of Court.

On a trial for murder where the evidence showed no overt act or statement of defendant showing that he did provoke the difficulty, but that the deceased cursed him a short while before and immediately at the time of the homicide, the same did not suggest the issue of provoking the difficulty.  Moreover, a charge that if defendant sought a meeting with deceased for the purpose of provoking a difficulty, etc., the same would destroy his right of self-defense, was error, as the mere seeking of a difficulty, without provoking it would not forfeit that right, but something must be said or done by defendant at the time calculated to provoke a difficulty.

#### 4.—Same—Charge of Court—Malpractice of Physician.

Upon trial for murder, unless the evidence showed some malpractice on the part of the physician causing deceased to lose his life, and that such malpractice was the proximate cause of his death, a charge on this phase of the case would be unauthorized.

#### 5.—Same—Assault to Murder—Aggravated Assault.

See opinion holding that the evidence did not entitle defendant to a charge on assault with intent to murder or aggravated assault.

Appeal from the Criminal District Court of Dallas.  Tried below before Hon. E. B. Muse.

Appeal from a conviction of murder in the second degree; penalty, thirteen years imprisonment in the penitentiary.

The dying statement of deceased was substantially (after stating that he was going to die, etc.), that he came from Midlothian, Texas, to Dallas on business; that later he went down to South End, and while there visited a saloon, they called the "Blue Goose"; that there he met a bartender whose name he thought was Henry Rushing, and the bartender they called Frank who worked at the Blue Goose; that he had learned since that his full name was Frank Leito; that deceased had been drinking but was not drunk; that about four o'clock on the morning of the 11th of November, 1904, deceased, Henry Rushing, and Frank Leito were shaking dice for the drinks; that they had had two rounds; that Henry Rushing had been stuck once and deceased once, and they were shaking the third time, when deceased noticed Frank Leito sliding the dice on him; that deceased told him not to do that for it was no use, that deceased would pay for the drinks; that he saw Frank Leito turn and heard something click, which deceased thought

was the cocking of a pistol; that Frank Leito turned behind deceased, and deceased asked whether he didn't have a pistol there; that then Frank Leito raised his gun and fired saying, "Yes, damn you, and I will make you feel it too"; that deceased was standing at the bar and made no move; that Frank Leito shot him for nothing; that deceased had no pistol or anything; that he was shot through the fleshy part of the groin; that he fell to the floor, and was unconscious for some seconds; that someone tried to put a pistol under his head, but he was left lying on the floor like a dog; that then Rushing asked Leito if deceased had a pistol, and Leito said, "Not that I know of"; that the officers came with an ambulance and took him to the hospital.

State's witness, S. J. Jenkins, testified that he left Midlothian and came to Dallas with deceased, and that he did not think deceased had a gun, although he could not swear to it; that if he had had a gun he would have known it, he thinks; that neither of them were drunk, that is to say very drunk, at the time of the accident; that he went out of the bar room, and that it did not seem to be over a minute when he heard the gun fire; that when he came back into the saloon the deceased was lying in front of the bar, and witness did not go to him because defendant told him not to, and had his gun in his hand; that defendant went out of the north door of the saloon.

State's witness, Ike Bingham, testified that he was a bartender in the South End of Dallas; that he knows defendant, and saw him between 3 and 4 o'clock on the morning, November 11, 1904, in his saloon, and was shortly afterwards followed by several other parties; that they were drinking and disputing among themselves, and witness told them they would have to get out, that he did not want any trouble there; that the defendant said that he would just have trouble with some of those fellows and have to shoot some of them if they did not let him alone; that witness told defendant to give him his gun and not have any trouble, which he did; that the gun was loaded and some time afterwards defendant came back and got it, but did not say what he was going to do with it, and made no threats of any kind against any one.

Two of the State's witnesses testified that they were sleeping together near the Blue Goose saloon, and that shortly after the shooting the defendant came to the door of witnesses' room, partly opened it and had a gun in his hand, and he said that he shot a fellow in there and wanted to get another cartridge from one of the witnesses and go back and finish the son-of-a-bitch, as dead men told no tales, etc.

Doctor Smith testified for the State that the deceased died January 3, 1905, from blood poison caused by a pistol shot; that deceased was brought to the hospital at about half-past seven o'clock, November 11, 1904; that deceased was suffering from a pistol wound in the thigh, which ranged directly through the leg from front to rear, and not in a slanting downward; that the physician in charge of the hospital was away at the time and did not return for three or four days after deceased was brought to the hospital, and did not perform an operation

on deceased immediately on his return; that two weeks after the arrival of deceased he was operated on by the physician of the hospital, which consisted in operating up the wound sufficiently to tie the artery; that two or three days after this operation gangreen showed up and the second operation was performed, which was an amputation of the leg above the wound; that witness did not consider a wound such as was inflicted on deceased as being necessarily fatal; that the wound showed evidence of blood poison within thirty-six hours from the time deceased was shot; that witness did not consider amputation the proper treatment; that in cases of this kind where amputation has been made immediately at least sixty out of every hundred recover; that death resulted of the wound; that the proper practice in cases of this kind is to use all means known to medical science to preserve the leg before amputation is resorted to; that witness treated the wound of deceased in conformity with the established rules of the practice laid down by all standard authorities; that witness thinks it was at his suggestion that amputation be performed that the operation was made; that witness had been in practice about seven years as a physician, and that he was a graduate of the University of Louisville, Kentucky.

The testimony for the defense showed, as related by defendant and his brother, that defendant caught deceased's right hand with his left hand and at the same time put his gun against deceased's belly; that deceased with his left hand struck the barrel of defendant's gun, knocking the same downward and it was discharged. Defendant testified on cross-examination on this point, "They asked me who shot Woolsey and I told them I reckon I had, and that I was on my way over to the jail to give up, and the officer said, 'well, come along with me and I will take you over there.' " One of the officers who arrested defendant, testified that at the time of the arrest defendant said he shot deceased. These witnesses for the defense testified that just before the shooting deceased cursed defendant, called him a God damn son-of-a-bitch, at the same time throwing his hand back and partially drawing his gun. There was also testimony on the part of defendant's witnesses contradicting the testimony of the State's witnesses with reference to their statement that defendant came to their door and asked for a cartridge, and that he had shot a man, etc. The defense also introduced a physician who testified that if blood poisoning in this case set up in thirty-six hours and the treatment was of no avail, amputation would have been the proper thing, and that he would not have waited two weeks to have amputated the leg if blood poisoning had set up in thirty-six hours, etc. But on cross-examination this witness testified that there was no fixed rule as to the proper time a limb should be amputated after its wound; that he did not treat the deceased, but that the physicians who did treat him were good and respectable physicians; that not having seen the deceased he would not tell the jury that his limb was not amputated at the proper time, and he would not say that

the doctors had been neglectful in not amputating until gangrene had set up, etc.

The testimony is very voluminous, but the above statement and that contained in the opinion substantially states the case.

*Albert W. Walker,* for appellant.—On question of threats, Hardy v. State, 31 Texas Crim. Rep., 289; Mathis v. State, 34 id., 39. On question of provoking a difficulty, Bird v. State, 87 S. W. Rep., 146; Thomas v. State, 31 Texas Crim. Rep., 82; Lynch v. State, 24 Texas Crim. App., 350; Stewart v. State, 15 id., 598.

*Howard Martin,* Assistant Attorney-General, for the State.

BROOKS, Judge.—Appellant was convicted of murder in the second degree, and his punishment fixed at confinement in the penitentiary for thirteen years.

Appellant's wife, Bertie Leito, testified that deceased was armed on the night of the homicide, was in and about Gables' saloon all night, drinking, cursing and displaying a pistol. At one time, while displaying the pistol he announced "he was going to get some damn son of a bitch in that place before morning." The same witness testified that deceased and appellant had been together a good deal that night, and for that reason she told appellant deceased was armed, and about the threats he made. George Warren, State's witness, corroborates the witness Bertie Leito as to the pistol and deceased's threat. Appellant testified that he wanted to get away from deceased, because his wife had told him that deceased was armed, and what deceased had said; and further, that at the time of the shooting deceased called him a damn son of a bitch, turned towards him and started to pull his gun. Witnesses for the defense further testify that deceased at the time of the killing was endeavoring to draw his pistol. We do not think this evidence authorized the court to charge on threats. This is practically all the testimony that even remotely bears on threats. It is too general a declaration on which to predicate a charge on threats. The fact that deceased was drinking and vowing he was going to kill some one in the house would not carry with it a threat against appellant, such as authorized a charge on the line suggested.

Nor do we think the evidence suggests the issue of an accidental killing. Nor is the evidence of that character as authorized the court to charge on negligent treatment of a physician.

Appellant complains of the charge of the court on provoking the difficulty, which is as follows: "If you believe that defendant committed the assault as a means of defense, believing at the time he did so (if he did do so) that he was in danger of losing his life or of serious bodily injury at the hands of the said Thomas Woolsey, then you will acquit defendant, unless you further believe from the evidence beyond a reasonable doubt that the defendant sought the meeting with

the said Thomas Woolsey for the purpose of provoking a difficulty with said Thomas Woolsey with intent to take the life of said Thomas Woolsey or to do him such serious bodily injury as might probably end in the death of said Thomas Woolsey and if you so believe from the evidence beyond a reasonable doubt, then you are instructed that if the defendant sought such meeting for the said purpose and with such intent, defendant would not be permitted to justify on the ground of self-defense, even though he should thereafter have been compelled to act in his own self-defense; but, if he had no such purpose and intention in seeking to meet the said Thomas Woolsey, then his right of self-defense would not be forfeited, and he could stand his ground and defend himself by the use of such means of defense as the facts and circumstances indicated to be necessary to protect himself from danger or what reasonably appeared to him at the time to be danger." This charge is erroneous. The mere fact that one seeks a party for the purpose of provoking a difficulty, would not forfeit his right of self-defense. He must do some other act or utter some word at the time calculated to provoke a difficulty before his right of self-defense would be forfeited. The mere seeking of it for that purpose, without provoking it, would not forfeit that right. We have discussed this phase of the law of provoking the difficulty so often that we do not see fit to further elaborate on the proposition, but refer to the decisions. McCandless v. State, 42 Texas Crim. Rep., 58; Bearden v. State, 79 S. W. Rep., 37; Dent v. State, 79 S. W. Rep., 525.

Furthermore, we do not believe that the evidence suggests the issue of provoking the difficulty at all. The bare presence of appellant would not be a predicate for such a charge. We have searched the records closely and find no overt act or statement of appellant, showing that he did provoke the difficulty. Appellant's testimony shows that deceased cursed him a short while before and immediately at the time of the shooting in which deceased lost his life. This being the condition of the record, it was error for the court to charge thereon at all.

In the absence of some malpractice on the part of the physicians, causing deceased to lose his life, and that such malpractice was the proximate cause of the death, we do not believe appellant was entitled to a charge on assault with intent to murder or aggravated assault. Upon another trial, if the evidence in reference to the death of deceased is the same as in this record, we would suggest that such charges be not given.

The judgment is accordingly reversed and the cause remanded.

*Reversed and remanded.*